FILED

04/24/2024

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 7, 2024 Session

## IN RE ISAIAH F.

**Appeal from the Chancery Court for Robertson County**
**No. CH21-CV-63    Ben Dean, Chancellor**

_____

**No. M2023-00660-COA-R3-PT**

_____

Foster parents appeal the dismissal of their petition to terminate a father's parental rights and to adopt. The petitioners sought to terminate the father's rights on two grounds: failure to file a timely petition to establish paternity and failure to manifest an ability and willingness to assume custody and financial responsibility for the child. The trial court found insufficient evidence to support either ground for termination. Upon review, we find clear and convincing evidence to support one of the alleged grounds. So we vacate the judgment of dismissal and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated
and Case Remanded**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT and KRISTI M. DAVIS, JJ., joined.

Thomas H. Miller, Franklin, Tennessee, for the appellants, Jeremy H. and Sarah H.

W. Stuart Scott, Nashville, Tennessee, for the appellee, Jay L.

Jonathan Skrmetti, Attorney General and Reporter, Katherine P. Adams, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Lisa Fiehweg, Nashville, Tennessee, Guardian ad Litem.

# OPINION[1]

## I.

### A.

In February 2019, the Tennessee Department of Children's Services ("DCS") received a referral of a drug-exposed newborn. Kristen R. ("Mother") tested positive for marijuana, amphetamines, and MDMA[2] at the delivery of Isaiah F. ("Child"). Although Mother was married to Phillip R., the Child's birth certificate identified David F. as his father. *See* Tenn. Code Ann. § 36-1-102(29)(A)(ii) (defining "legal parent"), (44) (defining "putative father") (Supp. 2020); *see also id.* § 36-1-117(c)(4) (Supp. 2020). Hospital personnel also reported that Mother and David F. were discovered using illegal drugs in the hospital parking lot after the Child's birth.

The Davidson County Juvenile Court immediately placed the Child in emergency protective custody. With the consent of Mother, David F., and Phillip R., the court later adjudicated the Child dependent and neglected based on Mother's drug use during pregnancy, David F.'s unavailability due to incarceration, and Phillip R.'s failure to parent despite legal paternity.

Over a year later, another man, Jay L., appeared with Mother at a permanency hearing in juvenile court. He told the juvenile court magistrate that he believed he could be the Child's father. The magistrate ordered DNA testing, which confirmed his claim. And Jay L. filed a pro se petition seeking custody of the Child. A short time later, DCS petitioned to terminate his parental rights as well as the parental rights of Mother and David F. Among other things, DCS alleged that Jay L.'s parental rights should be terminated for failure to file a timely paternity action. After retaining counsel, Jay L. amended his custody petition to include a request to legitimate the Child.

On February 8, 2021, Jeremy and Sarah H. ("Foster Parents") filed a petition to terminate all parental rights and to adopt the Child in Robertson County Chancery Court. The juvenile court stayed its proceedings pending resolution of the adoption petition. *See id.* § 36-1-116(f)(2) (Supp. 2020). So Jay L. re-filed his pending paternity petition in the chancery court. In July, the court entered an agreed order establishing Jay L. as the Child's legal father ("Father") and disestablishing David F. *See id.* § 36-1-102(29)(B).

---

[1] The appellants filed a motion to strike all references to post-judgment facts in Jay L.'s appellate brief. *See* TENN. R. APP. P. 14. We granted the motion and disregard post-judgment facts in our review.

[2] "MDMA is a synthetic drug commonly referred to as 'Ecstasy or Molly.'" *In re Emmalyn H.*, No. E2022-00710-COA-R3-PT, 2023 WL 3411598, at *1 n.3 (Tenn. Ct. App. May 12, 2023).

2

B.

The two termination petitions were consolidated for trial. Mother and Phillip R. had already surrendered their parental rights. Only Father's parental rights remained at issue. During trial, DCS and Foster Parents withdrew all but two of the alleged grounds for termination of Father's parental rights: failure to file a timely petition to establish paternity and failure to manifest an ability and willingness to assume custody or financial responsibility of the Child. *See id.* § 36-1-113(g)(9)(A)(vi), (g)(14) (Supp. 2020).

As Father related, he enjoyed a casual friendship with Mother, but their relationship was not always platonic. He first learned about Mother's pregnancy shortly before the Child was born. At that time, Mother told him that David F. was the biological father. From what Father knew of the timing of her pregnancy and delivery, he did not question her claim. But in June 2019, Mother notified Father by email that he might be the Child's biological father.

Father claimed that he was overjoyed at the news. He knew the Child was in foster care. So he immediately went to the local DCS office and asked for a DNA test. The receptionist gave him the contact information for the family service worker assigned to the Child's case. Father told the family service worker that he wanted to take responsibility for the Child if he was the biological father. According to Father, he spoke with the service worker several times throughout the summer and fall of 2019. Each time, she assured him that DCS was investigating his paternity claim. From their conversations, he understood that the process would take some time due to her heavy caseload. But he never heard back from DCS.

Father's efforts to establish paternity did not stop with DCS. He also reached out to Mother's court-appointed attorney. Mother claimed her attorney would pursue the matter with DCS. But the attorney never returned Father's calls. He also planned to try an at-home DNA test when Mother was released from jail. But he never had the opportunity. In the spring of 2020, Father contacted the juvenile court clerk's office as well as other state agencies, inquiring about the process for obtaining a DNA test for a child in foster care. He received few responses, none helpful. Then, in November 2020, Mother invited him to the juvenile court hearing where he was finally able to assert his paternity claim.

Because of the Child's age and special needs, the juvenile court initially denied Father visitation. It assigned Julie Flannery, a clinical psychologist who worked with the court, to educate Father on the Child's medical conditions. And it directed Father to record and exchange video messages with the Child. After Father established paternity, the chancery court allowed limited supervised visitation. Ms. Flannery supervised those visits. She testified that Father worked hard to educate himself about the Child. Based on her observations, she had no concerns about Father as a parent. Over time, Father and the Child had formed a bond.

Father understood that reunification with the Child would be a slow process. He had spoken with Dr. Jay Woodman, a clinical psychologist, about creating a successful transition plan. To that end, he expressed his hope that Foster Parents would remain a part of the Child's life.

Foster Mother explained that the Child needed an "incredible amount of support" to reach his full potential. And she knew "beyond a shadow of a doubt" that he would receive that support in her home. The Child had been diagnosed with neonatal abstinence syndrome, autism spectrum disorder, and reactive airway disease. Foster Parents spent more than 600 hours in various therapies with the Child, including developmental therapy, speech and language therapy, feeding therapy, and physical and occupational therapy. At three years old, he had made tremendous progress. Foster Parents loved him and wanted to adopt him.

Ms. Peak, a licensed clinical social worker, testified as an expert witness on behalf of the petitioners. She did not perform an assessment on the Child, the foster family, or Father. As she explained, her opinions were based on theory and research, not this particular child. Research showed that severing a consistent, predictable relationship affected an infant's mental health. In her opinion, every disruption in a child's life was a trauma that would have an effect on a child's development, especially if the child already had a cognitive impairment or developmental delay.

Father presented the expert testimony of Dr. Woodman. Dr. Woodman explained that he met with Father several times and observed two supervised visits with the Child. He also consulted Ms. Flannery. He observed that Father had forged a bond with the Child. In his opinion, the Child would be negatively affected if his relationship with Father was terminated. Dr. Woodman agreed that removal from the foster home would disrupt the Child. But, under the circumstances, he believed the Child would ultimately thrive in Father's care.

The current family service worker asserted that DCS had no record of Father's paternity claim before November 2020. DCS no longer employed the case worker Father claimed to have contacted. So she could not verify his story. She explained that DCS did not provide DNA testing for putative fathers. It was DCS policy to advise paternity claimants to go to juvenile court for testing.

In her view, the Child loved his foster family. And it would be in his best interest to remain in his current environment. Still, she admitted that Father and the Child had developed a good relationship. Father had a steady income and stable housing. And his parenting assessment revealed no concerns.

4

## C.

Shortly after the trial, the judge's term ended. And the presiding judge reassigned the case to a new chancellor for resolution. *See* TENN. R. CIV. P. 63. The successor chancellor reviewed the existing record and determined the case could be resolved without prejudice to the parties. Before announcing a decision, he questioned counsel to confirm that he fully understood the parties' positions. And he gave the parties an opportunity to provide any additional information they deemed necessary.

The court made its final ruling based on the existing record and the responses of counsel. It determined that the petitioners failed to establish either alleged ground for termination of Father's parental rights. So it dismissed both termination petitions without reaching the best interest analysis.

## II.

Father contends that we should dismiss this appeal as a matter of law because the trial court failed to ensure an expedited final hearing. *See* Tenn. Code Ann. § 36-1-113(k). By statute, termination proceedings must be expedited. *Id.* § 36-1-124 (2021). To that end, Tennessee Code Annotated § 36-1-113(k) directs the trial court to "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Foster Parents filed their termination petition on February 8, 2021. Although the case was initially set for trial within the six-month window, the court continued the trial date two times. Father complains that the court granted the first continuance without determining that an extension was in the Child's best interest.

Although a trial was not conducted within six months of the petition to terminate, we discern no reason to dismiss the appeal. First, even if Father's complaints had merit, dismissal would not be an appropriate remedy. Father should have sought an order from this Court expediting the proceedings in the trial court. *See id.* § 36-1-113(k). He chose not to do so. Second, Father misconstrues the trial court's order. The order clearly implied that the extension was in the Child's best interest. *See Morgan Keegan & Co., Inc. v. Smythe*, 401 S.W.3d 595, 608 (Tenn. 2013) (when "construing orders and judgments, effect must be given to that which is clearly implied, as well as to that which is expressly stated"). And the court later expressly clarified that it considered the Child's best interest when it granted the first continuance.

## A.

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one

statutory ground for termination. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); Tenn. Code Ann. § 36-1-113(c)(1). If they prove the existence of one or more statutory grounds, they must then prove that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d at 546). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); TENN. R. APP. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

Foster Parents contend that the trial court erred in dismissing their termination petition. In their view, clear and convincing evidence supported both alleged grounds for termination of Father's parental rights. DCS does not share their view. On appeal, DCS sides with Father, who argues that the trial court's judgment was correct.

1. Failure to File a Timely Paternity Action

Foster Parents insist that clear and convincing evidence supported termination of Father's parental rights for failure to file a timely petition to establish paternity, a ground applicable to putative fathers. Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi). Father concedes that he was a putative father when Foster Parents filed their petition. *See id.* § 36-1-102(44). And we agree. *See id.* § 36-1-117(c)(3).

As a putative father, Father's parental rights were subject to termination if he "failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity." *Id.* § 36-1-113(g)(9)(A)(vi). Father testified that Mother notified him in June 2019 that he might be the Child's biological father. Mother's message provided

6

the requisite "notice of alleged paternity." *See id.* § 36-1-113(g)(9)(B)(i) (defining notice to include the mother's written statement "to a person who is believed to be the biological father or possible biological father of the child"). Yet Father did not file a petition to establish paternity until 2021.

The trial court reasoned that Father's failure to file a timely petition was "not willful" because he "made and took every reasonable effort" to establish paternity. It credited Father's testimony that after he received Mother's message, he immediately contacted DCS.[3] He provided the family service worker with his personal information, and she told him that DCS would investigate his claim. But rather than investigate, DCS simply "ignored Father's request" and then "actively thwarted and delayed Father's efforts to discover if he were . . . father to [the] Child."

After a de novo review of the record, we conclude there is clear and convincing evidence to support this ground for termination. We cannot ignore the plain language of the statute. *In re Adaline D.*, No. E2020-01597-COA-R3-PT, 2021 WL 5297683, at *11 (Tenn. Ct. App. Nov. 15, 2021). Foster Parents were not required to prove that Father's conduct was willful. *See In re E.C.*, No. E2016-02582-COA-R3-PT, 2017 WL 2438574, at *8 (Tenn. Ct. App. June 6, 2017); *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *8-9 (Tenn. Ct. App. Apr. 25, 2005) (reasoning that the termination grounds in (g)(9) "are less difficult to prove" in part "because they do not include a willfulness requirement"). Nor does this ground "expressly require that DCS exert reasonable efforts to assist Father in establishing himself as a legal parent."[4] *In re E.C.*, 2017 WL 2438574, at *10; *see, e.g.*, *In re Samone D.*, No. W2021-01225-COA-R3-PT, 2023 WL 1962016, at *14 (Tenn. Ct. App. Feb. 13, 2023) (rejecting putative father's argument that DCS's failure to assist him excused his failure to file a petition); *In re Jase P.*, No. E2016-02519-COA-R3-PT, 2017 WL 2672781, at *9 (Tenn. Ct. App. June 21, 2017) (rejecting argument that "DCS could establish Father's paternity more readily than Father").

Father learned he could be the Child's biological father in June 2019. He did not file a petition to establish paternity of the Child until 2021. As these facts are undisputed, Foster Parents proved this ground for termination of Father's parental rights. *See In re Rilyn S.*, No. E2018-00027-COA-R3-PT, 2019 WL 1130442, at *10 (Tenn. Ct. App. Mar. 12, 2019) (reasoning that clear and convincing evidence supported this ground for

---

[3] We typically give great deference to a trial court's credibility assessments. *Watson v. Watson*, 309 S.W.3d 483, 490 (Tenn. Ct. App. 2009). But here the court's findings were based on the trial transcript and exhibits, not in-court testimony. So we may draw our "own conclusions with regard to the weight and credibility" of the evidence. *Kelly v. Kelly*, 445 S.W.3d 685, 693 (Tenn. 2014).

[4] The "extent of DCS's efforts to reunify the family is weighed in the court's best interest analysis." *In re Kaliyah S.*, 455 S.W.3d at 555.

termination when it was undisputed that, "despite having notice of his alleged paternity, Father failed to file a petition to establish paternity within thirty days").

2. Failure to Manifest an Ability and Willingness to Assume Custody

Foster Parents also contend that termination of Father's parental rights was appropriate under Tennessee Code Annotated § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he "[1] failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody . . . of the child, and [2] placing the child in the [parent's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). The statute does not define precisely the circumstances that might pose a risk of "substantial harm" to a child. *See id.* But the risk must come from the child's placement in the parent's legal and physical custody. *Id.* And the harm must be "a real hazard or danger that is not minor, trivial, or insignificant" and is "more than a theoretical possibility." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001). Both the failure-to-manifest and the substantial-harm prongs must be established by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

Foster Parents argue that we must assess Father's ability and willingness as of the date the termination petition was filed. We have previously held that the most relevant time period for this ground is the time preceding the filing of the petition to terminate parental rights. *In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *7 (Tenn. Ct. App. Dec. 27, 2017). But the court may also consider the parent's actions after the petition was filed. *In re Kendall K.*, M2021-01463-COA-R3-PT, 2022 WL 10331612, at * 7 (Tenn. Ct. App. Oct. 18, 2022); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *7 (Tenn. Ct. App. Apr. 23, 2020).

Like the trial court, we find Father evidenced both an ability and willingness to assume custody and financial responsibility for the Child. Father had a steady income and a suitable home. Early on, he informed DCS that he wanted to parent the Child. He made numerous efforts to obtain a DNA test. Once established as the legal father, he took advantage of every opportunity to learn about the Child's medical condition and special needs. Through the exchange of videos and in-person visits, Father and the Child formed an undeniable bond.

We also conclude that the evidence of substantial harm fell short. Ms. Peak described the adverse effect separation from a stable, predictable relationship can have on a young child, especially one with special needs. But she did not address whether this particular child would face more than a theoretical risk of harm to his psychological welfare if placed in Father's custody.

B.

Finally, Father seeks an award of attorney's fees at trial and on appeal as the prevailing party in a custody dispute. But we have previously held that one of the statutes that Father relied on, Tennessee Code Annotated § 36-5-103(c), does not apply to parental termination cases. *See In re Makenzie L.*, No. M2014-01081-COA-R3-PT, 2015 WL 3793788, at *21 (Tenn. Ct. App. June 17, 2015); *In re Nathaniel C.T.*, 447 S.W.3d 244, 247 (Tenn. Ct. App. 2014); *Bryant v. Bryant*, No. 01A01-9806-CV-00337, 1999 WL 43282, at *6 (Tenn. Ct. App. Feb. 1, 1999). We see no reason to depart from our prior precedent.

He also requests attorney's fees as damages for a frivolous appeal. Tenn. Code Ann. § 27-1-122 (2017). A frivolous appeal is one "utterly devoid of merit." *Combustion Eng'g, Inc. v. Kennedy*, 562 S.W.2d 202, 205 (Tenn. 1978). This appeal was not totally devoid of merit. Foster Parents were partially successful. So we also decline to award Father attorney's fees on this basis.

**III.**

We conclude that the trial court erred in dismissing the Foster Parents' termination petition. The record contains clear and convincing evidence to support termination of Father's parental rights for failure to file a timely petition to establish paternity. So we vacate the court's judgment and remand for further proceedings consistent with this opinion. On remand, the court should consider whether termination of Father's parental rights is in the Child's best interest and enter an appropriate order. *See* Tenn. Code Ann. § 36-1-113(k). The current custody arrangement shall remain in effect pending the entry of a new final order.

_____s/ W. Neal McBrayer_____
W. NEAL MCBRAYER, JUDGE

9